## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **YONG KIM,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **VILLANOVA UNIVERSITY,** | **NO.  21-1879** |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Yong Dou (Michael) Kim spent fourteen years pursuing a Ph.D. in Defendant Villanova University's Philosophy Ph.D. Graduate Program.  During those years, he struggled with numerous personal challenges.  He moved from Pennsylvania to Colorado to care for his ailing father, who later passed away.  He supported a roommate with severe mental illness.  He wrestled with his own mental health problems.  He managed all of this while working multiple jobs to support himself and his parents, attempting to advance his teaching career.  And he was also pursuing his doctorate at Villanova.  Although Defendant has a policy requiring philosophy doctoral students to complete their course requirements in eight years, Plaintiff was granted an extension to complete his coursework in 2014 (year 8), in 2017 (year 11), in 2019 (year 13), and finally in 2020 (year 14).  By May 2020, he still had not completed numerous course requirements:  He owed papers for two classes; he needed to take a language exam and a preliminary exam; and he had not defended his dissertation prospectus or finished his dissertation.  On May 18, Plaintiff's fifth request for an extension was denied and he was dismissed for "lack of satisfactory progress toward his dissertation."  Plaintiff appealed this decision twice and was twice unsuccessful.  Plaintiff now asserts that his dismissal violated Pennsylvania common law due process.  Defendant has filed a Motion for Summary Judgment

under Federal Rule of Civil Procedure 56.  For the reasons that follow, Defendant's Motion will be granted.

## I.   LEGAL STANDARDS

To prevail at summary judgment, "the movant must show that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Nat'l State Bank v. Fed. Reserve Bank of N.Y.*, 979 F.2d 1579, 1581 (3d Cir. 1992) (quoting Fed. R. Civ. P. 56(c)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A factual dispute is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248.  "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007).

The movant bears the initial burden of identifying those portions of the record "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Then, the non-moving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.  "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*)).

## II.   FACTUAL BACKGROUND

To earn his doctoral degree, Plaintiff had to complete 48 credits of course work, pass two

language examinations and a preliminary examination, prepare and defend a written dissertation proposal (or "prospectus"), and write and defend a dissertation.  At all times relevant to this case, Villanova's Graduate Liberal Arts and Sciences Handbook (the "Graduate Handbook") provided that full-time students in Plaintiff's program had to "complete all their degree requirements within an eight-year time period," and that "[r]equests for an extension will only be granted for up to two additional years."

The Graduate Handbook contains the "satisfactory progress policy" for doctoral students, which explains that "satisfactory progress" is assessed on the basis of "academic performance, *as well* as by meeting the various deadlines for language examinations, qualifying examinations, dissertation proposal defense, and any other specified requirements" (emphasis added).  "A student who fails to maintain satisfactory progress may . . . have one's candidacy terminated." Dismissal may occur "without a probationary period" and is "[t]ypically . . . effective immediately."

### i.   The First Extension

Plaintiff began his studies at Villanova in 2006.  His academic career first began to veer off course in 2011.  His father suffered from Alzheimer's disease and at that time, his condition began to deteriorate.  Plaintiff moved from Pennsylvania to Colorado to help care for him.  Upon learning of this situation, then-Director of Graduate Studies, Dr. Julie Klein, advised Plaintiff in an email that he could "find a way to take your work to Denver or [] take a leave of absence."[1] Plaintiff never took a leave of absence.

---

[1] Plaintiff does not dispute the authenticity of any of the emails in the record.  His repeated defense to Defendant's reliance on them is that they cannot be "considered in isolation and without context."  This general objection, without citation to specific facts placing the emails in dispute, does not create a genuine issue of material fact.  *See Celotex Corp.*, 477 U.S. at 324; *Abington Friends Sch.*, 480 F.3d at 256.

3

In May 2014, Plaintiff's faculty advisor, Dr. Walter Brogan, advised Plaintiff that he had reached the 8-year limit for completion of his studies.  He noted that Plaintiff had not passed his second language exam and had four incomplete courses on his record.  He suggested that Plaintiff could request a two-year extension and proposed a timeline for completion of Plaintiff's coursework.  Plaintiff replied that he understood "the necessity of making measurable progress." He followed Brogan's advice and requested an extension, which was granted through December 2017, a period of three years and seven months.  This extension included retroactive credit for a 1.5-year leave of absence, to account for Plaintiff's time in Colorado.

### ii.    *The Second Extension*

By March 2016, Plaintiff had completed one of the four incomplete courses.  He sent Brogan a proposed timeline to complete the three remaining courses, pass his language exam and his preliminary exam, and draft and defend his dissertation proposal, all by the end of the year. Plaintiff sent Brogan his draft dissertation proposal in August 2016, but Brogan informed him that he could not schedule the proposal defense until Plaintiff had finished his courses.

By March 2017, Plaintiff still had incomplete courses and had not taken the outstanding language exam, which had prevented the scheduling of his "prelims."[2]  His goal at that time was to finish all of these tasks and write a dissertation draft by the end of 2017.  He was "aware" that he was "at the 10-year mark and need to accomplish a lot in the next few months."  He requested an extension "to the end of the calendar year," and was given until May 2018.

### iii.    *The Third Extension*

By December 2018, Plaintiff was still working on his degree and had sent Brogan two

---

[2] This abbreviation, scattered through the emails in the record, appears to refer to the preliminary exam requirement.

draft chapters of his dissertation.  On December 4, he told Brogan and then-Director of Graduate Studies Annika Thiem that he planned to finish the draft dissertation by the end of the year, and to take his language exam afterwards, "immediately at the start of the spring semester."  He also had plans to submit papers for his incomplete classes by the start of that semester, which "would clear the way to do the remaining pieces."

Plaintiff expressed his appreciation of "the fact that you are tolerating my attempt to do the process 'backward.'"  Brogan informed Plaintiff that he could not "officially move forward with the prelims until the incomplete are [sic] done," and Thiem told Plaintiff that he had to pass his language exam and finish his incomplete courses before he could be approved to take the "prelims."

In January 2019, Thiem requested an extension of two additional semesters for Plaintiff. This extension was approved by then-Interim Graduate Dean Dr. Christine Palus provided "that all requirements except the dissertation are fulfilled by the start of Fall 2019 and the dissertation will be defended by the end of Fall 2019.  If a full acceptable draft is in the hands of the committee by December 1, 2019, an additional extension to defend the dissertation in January or early February 2020 . . . would be granted."  Thiem informed Plaintiff that he would have to "pass the language, finish the incompletes, prelims, and proposal defense by the end of Spring 2019."

### iv.     The Fourth Extension

In May 2019, Plaintiff informed Klein that he was "working backwards," and had nearly completed a draft of the second half of his dissertation, and expected to "do the formal steps necessary (proposal, etc.) at the start of the fall."  Plaintiff told Klein that he and Brogan "thought that as long as everything gets done, it shouldn't be a problem to work backwards as far

as the formal steps are concerned."

In October and November 2019, Klein asked Plaintiff for updates.  On November 26, Plaintiff responded that he had "forgotten about the specific terms" of his extension and planned to have the rest of his draft dissertation to Brogan by the end of the month.  Klein responded that "everything but the [dissertation] defense is supposed to be done by December 1 2019. . . .  The Dept is not free to change the terms set by the Dean.  If you will not meet the terms of the agreement with Dean Palus, your ONLY option is to write to Dean Woodard," the new Graduate Dean.

Later that day, Plaintiff asked Woodard to grant an additional extension until the end of the academic year.  He explained that, "[d]ue to a misunderstanding about the terms of that extension," he and Brogan "had been working under the assumption that I had until the end of this academic year."  He stated that he would "submit the two remaining incomplete seminar papers imminently" and then "would immediately schedule the prelim exam (as well as the second language exam)."

On January 10, 2020, Woodard approved this request.  Klein wrote to Plaintiff that day, informing him that he "must have a director-approved complete draft of your thesis to the entire committee by February 28, 2020."  She told him that he was "responsible for working with your director and committee to meet these deadlines" and that "any and all pre-dissertation obligations (e.g. incompletes, language exams) must be taken of very quickly."

### *v.    Plaintiff's Dismissal*

Plaintiff did not communicate with Klein or Brogan again until April 16, 2020, when Klein reached out to him for an update.  Plaintiff responded on April 22:

> I had thought that I might still salvage the semester by getting everything
> to [Brogan] toward the end of this month but that might be a moot point

> since the Dean's extension was only until the end of the semester and there
> is no longer time to complete all the steps.  I suppose if I were to have
> everything submitted by the end of this semester, I might ask the Dean if
> he would let the formal steps (e.g., scheduling the prelims, proposal, etc.)
> happen in the summer/fall but I am also cognizant that I have already tried
> everyone's patience for far too long, so I don't really know how to proceed
> in this situation.

That same day, Klein answered that Plaintiff's "only option is to write directly to the Dean"

because "[e]ven submitting 'everything' in March would have required an extension from the

Dean, since you would not have met our requirements for the exams and the submission of a

complete version of the thesis to your director by February 28, 2020."  She added, "I would write

to him asap."

On April 28, Klein informed Woodard that, to complete his degree "would have required

Mike to take his exams and submit a dissertation draft by March 1, 2020.  Mike was not in touch

with us, and none of that work has been completed."  She advised that, if Plaintiff did not request

another extension, "we will need to go through the steps to dismiss him from the program."  She

emphasized that "we have been through multiple cycles of failed plans to finish papers (he still

has two incompletes), finish the language requirement, take the comprehensive exams, pass a

prospectus defense, and complete the dissertation."

Almost a month after Klein advised him to do so, on May 18, 2020, Plaintiff asked

Woodard for an additional extension through fall 2020.  Woodard denied this request.  He noted

that "[y]ou are into your 14th year of the program" and listed Plaintiff's outstanding academic

requirements: six credits of course work; the language exam; the preliminary exam; the

preparation and defense of a dissertation prospectus; the completion and defense of the

dissertation.  Woodard explained that it was "neither feasible nor fair" to Plaintiff or the program

to "reasonably expect that you will complete these requirements by December 2020. . . .  Given

your lack of apparent satisfactory progress toward degree completion, further accommodations do not seem appropriate."

In the official letter of dismissal sent to Plaintiff that same day, Woodard wrote:

> Dr. Julie Klein, program director in the PhD in Philosophy program, recently conducted a review of satisfactory progress of doctoral students. Dr. Klein contacted you in April regarding your failure to maintain satisfactory progress towards your dissertation and the completion of the doctoral program.  At this point, you have not completed your required exams nor have you submitted a draft dissertation.  You are now ending your fourteenth year in the program.  Per the satisfactory progress policy for doctoral students, you must be terminated from the program effective May 19, 2020.

### vi.   *Plaintiff's First Appeal*

On June 19, Plaintiff appealed his dismissal via email to Klein and Brogan.  He attached a draft dissertation that was "85-90% complete" and maintained that "the two remaining incompletes can be dispatched on the basis of some of the material already completed for the [dissertation] itself."

Klein informed Plaintiff that the University's policy required him to "have a valid reason to appeal, such as medical or other extenuating circumstances," and that he had to explain "why you were unable to complete the work under the previous time-to-degree extension authorized by the Dean and are now requesting another extension."  Plaintiff responded by referring to his father's ill-health (his father passed away in 2015), that someone else had had "severe mental health issues" requiring hospitalizations; the onset of the COVID-19 pandemic in March 2020; and his own mental health.  He believed that it was "reasonably conceivable and possible for me to complete the necessary requirements."

Meanwhile, Brogan and Klein discussed Plaintiff's appeal.  Brogan wrote that "any positive response to his appeal should include a demand that [the two incompletes] be finished

by the end of summer," followed by "his prelims in August, defend his proposal in September and revise his dissertation and defend it by December."  Brogan expressed that "I have enough confidence in advance to give it a go with him."  He added that "[o]bviously it is not up to me to decide if his appeal is approved" and that he needed "some time to look at" the draft dissertation "before I can be fully supportive."

Klein agreed that Brogan "should decide if the draft material is viable" and stated that "if faculty will accept the incomplete plan, if he can pass the language AND there is some legitimate reason he failed to do this work in either of his previous extensions, then I could imagine a successful appeal. We are talking about a third special extension and year 15."

On June 25, Klein wrote to Woodard, because "[p]er the CLAS Graduate Studies Policy, it falls to me as Director of Graduate Studies to consult with Department Faculty and to make a recommendation to you."  She recommended that Plaintiff's appeal be rejected "on the grounds that (1) Mr. Kim received two extensions but did not complete the work; and (2) reinstating him would undermine the academic integrity and ultimately the reputation of the PhD program."  She took the position that, "[w]ith each extension, Mr. Kim failed to heed explicitly stated deadlines and submit the required written work and complete exams in a timely manner."  She also noted that Plaintiff's "letter of appeal makes no mention of meeting his obligation to pass a second research language exam" and expressed her concern that Plaintiff had "bypassed" the "essential steps of consultation and supervision" built into the program, *i.e.*, his "Preliminary Exam and Dissertation Prospectus Defense," and "now asks to be reinstated in view of a dissertation draft prepared on his own."  To accept Plaintiff's work, Klein opined, would be to "concede that our own requirements concerning consultation and supervision are in fact irrelevant to earning a degree in the Department.  Thus we would undermine our own Program."

On July 2, 2020, Woodard informed Plaintiff that his appeal had been denied.  He noted the extensions granted to Plaintiff in 2019 and 2020, and the fact that "[a]s of February 28, 2020 and prior to the disruptions of COVID 19, the following pre-dissertation degree requirements remained outstanding: 1. Language examination 2. Papers for two incomplete courses 3. Preliminary examination 4. An approved dissertation prospectus."  These items "were to have been completed at the beginning of fall 2019" and "remained outstanding as of May 18, 2020 when I sent your dismissal notification."  He noted that, had "these pre-dissertation requirements at least been completed, I could have considered a further extension to focus on completing the dissertation," but "completing all of the requirements, writing a dissertation and defending a dissertation by the end of the academic year when your advisor retires seems overly ambitious. To do so by the end of the fall 2020 semester as you proposed . . . not only seems improbable but a challenge to the integrity of the doctoral education process the faculty in Philosophy have worked so hard to create."  Woodard concluded, "you were unable to complete the plans that you proposed to satisfactorily complete degree requirements.  Your appeal does not really address why your prior plans fell short and thus fails to instill any confidence that a further extension would produce a different outcome."

### vii.     Plaintiff's Second Appeal

After the denial of Plaintiff's appeal, on July 6, 2020, Brogan emailed Woodard, stating that "[t]he reasons for your decision to reject his appeal were very clearly stated and indisputable.  Mr. Kim has been given several opportunities to complete these requirements and has to date failed to do so."  But Brogan wrote "just to make sure that you were fully apprised of his recent accomplishments that significantly change how one might judge his current situation." Brogan explained that he had received a "nearly complete draft" of Plaintiff's dissertation; and

that Plaintiff had finished one paper for his incomplete classes and submitted the complete package for his preliminary examination.  Brogan also raised a procedural concern: that "[t]he protocol indicates that the appeal will first go from the graduate director to the graduate committee for discussion and for a recommendation to you from both the graduate committee and the graduate director. . . .  I was waiting for that meeting and discussion."

On July 13, Brogan wrote to Woodard and Klein again, "hoping that a reconsideration of his dismissal is possible in that I am in possession of his completed dissertation."  Brogan noted that he had been "in the process of reading the dissertation to see whether it provided viable grounds for a positive response to his appeal when the final dismissal letter was issued."  He posited that "the fact that Kim has indeed written a dissertation already is a significant correction of the facts" on which the dismissal was based.

Woodard responded that "[a]fter carefully reviewing the additional information" provided by Brogan, his "standing on the matter remains unchanged."  He noted that evidence of Plaintiff's work had "only materialized after several unanswered requests for status updates from your program's director and my letter of dismissal."  While he was sure that the dissertation reflected Brogan's "usual high standards," he emphasized that "the dissertation is more than an end product. It is a reflection of the certifying experience in which there is a process that is assiduously followed. . . .  [I]t is clear that the dissertation process as outlined by your program has not been followed," because Plaintiff had not successfully completed his preliminary examination or prepared and defended a proposal.  "The completion of an out of process document does not remedy the matter for me,"  Woodard explained.  "It challenges the integrity of the dissertation process as a qualifying element in doctoral study in the College."  Because Plaintiff's submissions "occurred outside the appropriate channels . . . , I cannot recognize them

11

as official at this point."  He concluded, "given the amount of work necessary to satisfy degree requirements (dissertation requirements, language exam requirements, etc. . .), any appeal to the University would be without merit."

Woodard acknowledged that there had been a "breach of protocol in the consideration of Mr. Kim's appeal," but that in light of the "unique challenges [of] convening your program's graduate committee over the summer in the midst of COVID-19," he was "confident that Mr. Kim received all due consideration from the program and the department. . . .   Nonetheless, should you insist, I would be pleased the review the recommendation from a convened meeting of your graduate committee that speaks to how the integrity of the degree requirements/process can be maintained while granting Mr. Kim's appeal."

Brogan did not insist.  He assured Woodard of his understanding that, "regardless of the information I conveyed regarding Mr. Kim, that your decision to reject his appeal is more than justified."  Although he emphasized that "[m]y concern about due process is not bureaucratic. I really do think my input as his director, the input of his committee and of his professors should have been solicited," he concluded by reiterating that "I understand that the decision is justified. I do not want my personal disappointment about the process to become an issue. . . .  I accept your decision as final."

On July 14, Brogan emailed Plaintiff to express his regret that his request for reconsideration had not been successful and his understanding that "the facts more than justify [Woodard's] decision and that he did not make it lightly."  Plaintiff then emailed Klein, raising concerns about the process of his appeal decision, including that it should have gone through Brogan and the graduate committee.  He reiterated his position that he and Brogan had made "pedagogical decisions that made sense *at the time* for me to work on the program

requirements 'out of order,'" and that these "potentially mitigating considerations . . . would

have at least addressed some of the dean's concerns about lack of progress."  Klein forwarded

this email to Woodard and the Chair of the Philosophy Department, Dr. Sally Scholz, noting that

"[t]he clearest reason to reject his appeals is his failure to submit any actual work during the

extensions."

The same day, Plaintiff emailed Woodard directly, repeating his concern that Brogan was

not consulted, and describing the work he had recently accomplished.  He wrote:

> I acknowledge that this procedure of "working backwards" is perhaps
> objectionable but the point is that it made pedagogical sense *at the time*.
> We were aware of the risks involved, i.e., that it would make my progress
> invisible to my official records.  But [Brogan] felt that given the situation
> – including my work/life situation, mental health, etc. – the most effective
> path forward would not be to slavishly follow an arbitrary sequence but,
> rather, to do what would enable the dissertation to be completed with
> philosophical integrity.

On August 23, Plaintiff officially appealed his dismissal for the second time by emailing a letter

to Woodard.  The letter developed the reasons supporting the three grounds he urged in favor of

reconsideration: (1) that the graduate school's policy for appeal was not followed; (2) that there

was precedent for such extensions; and (3) that there were substantive corrections to the facts

relevant to Woodard's decision.  He provided additional detail on the personal obstacles that had

impeded his progress in the program and submitted seven letters from professors at various

universities and from alumni of the Villanova Philosophy graduate program.  Brogan, too, wrote

once more to Woodard, stating "[t]he decision is justified.  Nevertheless, I think it might be a

good idea to reconsider in light of his clear explanation of mental health issues and severe family

hardships."

Upon receiving a copy of this letter from Plaintiff, Brogan responded that he had "already

written my views to the Dean and they reflected much of the information you again provided.  I am not willing to write again.  However, if the Dean does respond positively to your request, I am happy to support you in completing the program."  Professor John M. Carvalho wrote to Woodard in support of Plaintiff's second appeal.  Carvalho praised Plaintiff's research and writing for "their insight, creativity, and erudition" and urged Woodard to follow Brogan's advice, as the person who "can give the clearest, faithful account of the unusual course Michael followed to arrive at the point where he is now ready to finish his degree, and he has a cogent, detailed plan for bringing that degree to completion this year."

Before ruling on Plaintiff's second appeal, Woodard sought advice from Villanova Dean Adele Lindenmeyr, who was open to giving Plaintiff a "final chance," provided he met certain deadlines.  Woodard then consulted with Scholz and Klein.  Scholz recommended that the General Counsel of the University be consulted because consideration of a second appeal would be contrary to the Graduate Handbook, which provides that "[o]nce a student has been dismissed, he or she is permitted one appeal."

On September 16, Woodard sent Plaintiff the bad news.  He wrote that he had done his "best to continue to explore ways that I may rule differently on your case" but was "unfortunately affirmed in my decision to deny your appeal."  He stated that he had "carefully reviewed the documentation that you provided along with the considerable record surrounding your case and believe that the relevant details that served as the foundation of my decision have not been misconstrued" and that "our policies for dismissal and appeals were reasonably followed under the constraints posed by our current experience with COVID-19."  He had hoped to "find a more amicable solution but none could be found that would simultaneously grant your appeal and maintain the integrity of our doctoral program in Philosophy."

### III.   DISCUSSION

#### A.  The Nature of Plaintiff's Dismissal

As an initial matter, Plaintiff argues that there is a genuine dispute of material fact about whether his dismissal from Villanova was academic or disciplinary.  Plaintiff maintains that "[t]he Court found that taking the allegations as true at the initial stage of the proceedings, that plaintiff was not dismissed for an academic reason" and that "[n]othing has changed in terms of an analysis for Summary Judgment."

This distinction is critical because it affects the legal standard under which Defendant's actions will be reviewed.  In disciplinary proceedings, a student is entitled to "those procedural safeguards which the school specifically provides," and the procedural safeguards in question must be "fundamentally fair."  *Psi Upsilon of Phila. v. Univ. of Pa.*, 591 A.2d 755, 758 (Pa. Super. 1991) (quoting *Boehm v. Univ. of Pa. Sch. of Veterinary Med.*, 573 A.2d 575, 579 (Pa. Super. 1990)).  By contrast, for academic dismissals, institutions enjoy considerable deference and their decisions will be overturned only if the record shows that "it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."  *Swartley v. Hoffner*, 734 A.2d 915, 921 (Pa. Super. 1999) (quoting *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)).

In ruling on a motion to dismiss, a plaintiff's allegations must be taken as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Accordingly, in ruling on Defendant's first motion to dismiss, the Court took the allegations in the Complaint as true and "assumed at this stage that Plaintiff was dismissed as a disciplinary matter rather than 'for any academic reason.'"  *Kim v. Villanova Univ.*, 2021 WL

4243442, at *3 n.3 (E.D. Pa. Sept. 16, 2021).

But that was not the Court's last word on the matter.  When Defendant filed a motion to dismiss the Amended Complaint, the Court ruled that:

> Plaintiff has now conceded that he was "terminated for lack of satisfactory progress toward his dissertation." The Graduate Handbook establishes that a termination on that basis is academic, not disciplinary. Plaintiff's contrary allegation that his dismissal was "not for any academic reason" is gainsaid by the language of the Handbook and by his concession that his termination was for lack of satisfactory progress.

*Kim v. Villanova Univ.*, No. 21-1879, ECF No. 25 (E.D. Pa. Dec. 22, 2021).

"Under the law of the case doctrine, once an issue is decided, it will not be relitigated in the same case, except in unusual circumstances." *Hayman Cash Reg. Co. v. Sarokin*, 669 F.2d 162, 165 (3d Cir. 1982).  This doctrine ensures that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *In re Cont'l Airlines, Inc.*, 279 F.3d 226, 233 (3d Cir. 2002).  It "does not apply to dicta and does allow for reconsideration of previously decided issues 'in extraordinary circumstances such as where: (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice.'" *United Artists Theatre Cir., Inc. v. Twp. of Warrington*, 316 F.3d 392, 397 n.4 (3d Cir. 2003) (quoting *In re City of Phila. Litig.*, 158 F.3d 711, 718 (3d Cir. 1998)).

Plaintiff has not identified any "unusual circumstances" that would arrest the operation of the law of the case doctrine here.  *Sarokin*, 669 F.2d at 165.  He has not pointed to new evidence suggesting that his dismissal was not academic in nature.  *United Artists Theatre Cir., Inc.*, 316 F.3d at 397 n.4.  Nor has he identified a supervening new law or demonstrated that the Court's earlier decision was "clearly erroneous and would create manifest injustice."  *Id*.  Therefore, the law of the case applies and the Court's prior finding that Plaintiff's dismissal was academic in

16

nature governs.

### B.  The Standard Applicable to Academic Dismissals

Pennsylvania courts "abide[] by a general policy of nonintervention in purely academic matters." *Swartley*, 734 A.2d at 921.  "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." *Id.* (quoting *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 96 n.6 (1978) (Powell, J. concurring)).

Therefore, as stated above, a "genuinely academic decision" cannot be overridden "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* (quoting *Ewing*, 474 U.S. at 225).  Thus, courts must determine whether "there is no rational basis for the university's decision or [whether] the decision . . . was motivated by bad faith or ill will unrelated to academic performance." *Id.* (alterations in original) (quoting *Stoller v. Coll. of Med., The Milton S. Hershey Med. Ctr.*, 562 F. Supp. 403, 412 (M.D. Pa. 1983)).[3]

### C.  Application to the Facts

The undisputed evidence in the record, recited at length above, leads inexorably to the conclusion that Defendant's academic dismissal of Plaintiff had a rational basis and was not motivated by "bad faith or ill will unrelated to [his] academic performance." *Swartley*, 734 A.2d at 921.

The Satisfactory Progress Policy warned that "satisfactory progress" is assessed on the basis of "academic performance, *as well* as by meeting the various deadlines for language

---

[3] To the extent Defendant's brief relies instead on the standards applicable to academic dismissals under the substantive and procedural due process protections of the United States Constitution, that reliance was misplaced because Plaintiff's case rests entirely on Pennsylvania common law due process.

examinations, qualifying examinations, dissertation proposal defense, and any other specified requirements" (emphasis added), and that the failure to make satisfactory progress could lead to termination of the student's candidacy.  Plaintiff's dismissal and the denial of his appeals were based on his failure to meet these academic deadlines despite four extensions over a period of six years.

The emails in the record consistently focus on Plaintiff's outstanding course requirements and his persistent need for additional time to complete them.  For example, at the end of April 2020, after Plaintiff missed the fourth extension deadline, Klein informed Woodard that to complete his degree, Plaintiff would have had to take his exams and submit his dissertation draft by March 1, but "none of that work has been completed," even after "multiple cycles of failed plans."  Woodard's informal email advising Plaintiff of his dismissal noted that Plaintiff was into his fourteenth year in the program and still had not completed so many requirements that it was "neither feasible nor fair" to expect him to complete them all by December 2020.[4]  As the culmination of these discussions, the official dismissal letter was explicitly based on the fact that Plaintiff had not made satisfactory progress because he had not completed his exams or submitted a draft dissertation.

In considering Plaintiff's appeals, the discussions between Woodard, Klein, and Brogan centered on these academic requirements and Plaintiff's continued inability to finish them.  Klein stated that she could "imagine a successful appeal" only if, in addition to completing his

---

[4] Plaintiff argues that Woodard's list of outstanding requirements was inaccurate because it did not give him credit for his completed draft prospectus (which he admits was not officially approved) or for his partially drafted dissertation.  But Plaintiff conceded that he had already made Woodard aware of those facts when he requested an extension, and even if Woodard's email was inaccurate on these points, that does not rise to the level of an issue of material fact as to whether his decision had a rational academic basis, *Abington Friends Sch.*, 480 F.3d at 256, given that the draft prospectus and the dissertation are just two of several outstanding requirements, all of which contributed to Plaintiff's failure to make satisfactory progress, and all of which he was supposed to but failed to complete during prior extensions.

coursework, Plaintiff could provide "some legitimate reason he failed to do this work in either of his previous extensions." Her recommendation to Woodard that Plaintiff's first appeal be rejected was premised on (1) his failure to complete his work despite prior extensions, and (2) his decision to "bypass" the "essential steps of consultation and supervision" that were prerequisites to his completion of a dissertation. Similarly, after the second appeal, she expressed her view that "[t]he clearest reason to reject [Plaintiff's] appeals is his failure to submit any actual work during the extensions."

Woodard's denial of Plaintiff's first appeal rested on the fact that he had received extensions already, and that as of his previous deadline of February 28, 2020, prior to the disruptions caused by COVID-19, he still had not completed his coursework. Had Plaintiff at least finished his dissertation pre-requisites, Woodard might have considered an extension just to finish the dissertation, but in light of everything that remained outstanding, he felt that to complete it all by the end of the year seemed "overly ambitious." Plaintiff's failure to explain "why [] prior plans fell short" destroyed any confidence Woodard might have had "that a further extension would produce a different outcome."

Brogan viewed Woodard's reasons for denying the appeal as "indisputable," and he acknowledged that Plaintiff "has been given several opportunities to complete these requirements and has to date failed to do so." Brogan supported Plaintiff's bid for reconsideration because he believed that Plaintiff had made significant strides towards completing his coursework, including a "nearly complete draft" of the dissertation and progress towards his incompletes. But Brogan's advocacy ultimately did not sway Woodard, not because he bore Plaintiff any ill will, but because "the dissertation is more than an end product." By advancing his dissertation without first completing his preliminary examination and a prospectus,

Plaintiff had not followed the "dissertation process."  For Woodard, Plaintiff's nearly-complete dissertation did not "remedy the matter" because it "occurred outside the appropriate channels" and therefore "challenge[d] the integrity of the dissertation process as a qualifying element in doctoral study."  He also noted that Plaintiff's work had only advanced *after* the dismissal and "several unanswered requests for status updates."  In denying Plaintiff's second appeal, Woodard acknowledged that he could not "speak to the quality of the end product," but explained that his "standing on the matter remain[ed] unchanged" because "the dissertation process outlined by [the] program has not been followed," and Plaintiff still had so many outstanding degree requirements that "any appeal to the University would be without merit."  Even Brogan acknowledged that Woodard's decision was "more than justified."

This evidence establishes that Defendant's decision to dismiss Plaintiff for failure to make satisfactory progress towards his degree had a rational basis grounded in academic judgment.  Defendant's Motion will be granted.[5]

An appropriate order follows.

---

[5] To survive summary judgment, Plaintiff had to "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp.*, 477 U.S. at 324.  In other words, he had to point to portions of the record showing a genuine issue about whether Defendant's decision had a rational basis or was instead "motivated by bad faith or ill will unrelated to academic performance."  *Swartley*, 734 A.2d at 921.  Plaintiff's brief is not a model of clarity.  He seems to raise two broad challenges to summary judgment.  First, he argues that the rules changed and selectively enforced against Plaintiff compared to similarly situated students.  But he conceded elsewhere in the record that he did not know the details of other students' situations.  Further, he only mentions students who took ten to thirteen years to finish their doctorate, and at the time of his dismissal, he was in his fourteenth year and still had not completed multiple degree requirements.  Plaintiff has not pointed to any other basis for his belief that he was treated differently.  This testimony is therefore insufficient to create a *genuine* dispute of fact about whether the dismissal had a rational academic basis.  *Abington Friends Sch.*, 480 F.3d at 256.  The second challenge is that there were fatal irregularities in the dismissal and/or appeal process.  As Plaintiff's dismissal was academic, not disciplinary, no particular process was required—Defendant needed only a rational basis for the decision.  *Swartley*, 734 A.2d at 921.  Any challenge related to process therefore fails to raise a dispute of *material* fact.  *Anderson*, 477 U.S. at 248.

**BY THE COURT:**

*/s/ Wendy Beetlestone*

_____
**WENDY BEETLESTONE, J.**